**Mark GREENWALD, Plaintiff**

v.

**TAMBRANDS, INC., Defendant**

**No. CIV.04–16–P–C.**

United States District Court,
D. Maine.

March 24, 2005.

Rebecca S. Webber, Linnell, Choate & Webber, LLP, Curtis Webber, Linnell, Choate & Webber, LLP, Auburn, ME, for Mark Greenwald, Plaintiff.

James R. Erwin, Pierce, Atwood LLP, Portland, ME, Danielle Y. Vanderzanden, Day, Berry & Howard LLP, Boston, MA, for Tambrands Incorporated, Defendant.

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

GENE CARTER, Senior District Judge.

Plaintiff Mark Greenwald commenced this action against his former employer, Tambrands, Inc., in the Superior Court of the State of Maine in and for the County of Androscoggin, alleging retaliatory termination in violation of Maine's Family and Medical Leave Act, 26 M.R.S.A. §§ 843 *et seq.* Defendant timely removed the action to the federal forum based upon this Court's diversity jurisdiction. *See* 28 U.S.C. §§ 1332 and 1441(a). Plaintiff subsequently filed an Amended Complaint (Docket Item No. 12), in which he asserts federal claims under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601–2619 (1994) (Count II), in addition to his state law claims under Maine's statutory counterpart (Count I). Defendant filed a Motion to Dismiss (Docket Item No. 14) based upon Plaintiff's alleged failure to comply with the notice requirements of the FMLA, which this Court denied. *See* Order Denying Defendant's Motion to Dismiss (Docket Item No. 18).

Now before the Court is Defendant's Amended Motion for Summary Judgment (Docket Item No. 46). Plaintiff filed a *response to* Defendant's Motion (Docket Item No. 52) and Defendant has filed its Reply (Docket Item No. 58). The Court has considered the parties' respective arguments and the summary judgment record. For the reasons set forth below, the Court will deny Defendant's Motion.

**I. Summary Judgment Standard**

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). " 'In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means

that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93–94 (1st Cir.2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995)). "A trialworthy issue exists if the evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law, and the evidence is 'sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.'" *De–Jesus–Adorno v. Browning Ferris Indus.*, 160 F.3d 839, 841–42 (1st Cir.1998) (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995)).

██ Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has presented evidence of the absence of a genuine issue, the nonmoving party must respond by "placing at least one material fact into dispute." *FDIC v. Anchor Props.*, 13 F.3d 27, 30 (1st Cir. 1994) (citing *Darr v. Muratore*, 8 F.3d 854, 859 (1st Cir.1993)).

## II. Factual Background

Defendant Tambrands manufactures TAMPAX tampons in its Auburn, Maine facility. Plaintiff Greenwald began working for Tambrands as a technician in or about December 2000. He was subsequently promoted to the position of Tech # 1 and promoted again to Tech # 2. Plaintiff's job responsibilities included running the line, clearing jams, quality control for produced tampons, and ensuring efficient operation of the line.

## A. Tambrands' Time Keeping Policies

Tambrands' employees generally work on one of two shifts throughout the day. Records of hours worked are maintained through an employee time-keeping program known as Employee Self Services (hereinafter "ESS"). In its payroll policies, Tambrands instructs employees as follows:

Time sheets are accessed via Employee Self Services. The time sheets are exception based. Employees who work their scheduled hours do not need to access their time sheets. Time sheet entries need to be made only when there is an exception to the scheduled work hours such as vacation, sick time, jury duty, overtime worked, etc. Any falsified hours input (such as overtime which was not worked) is cause for termination. All time sheets will be reviewed by department managers.

Tambrands' Payroll Policies, Attached as Exhibit F to Defendant's Amended Statement of Undisputed Material Facts (hereinafter "Defendant's SMF"). In other words, an employee needs only to access his/her timesheet to record exceptions to his/her regularly scheduled hours. The burden of recording these exceptions is placed upon the employee.

Tambrands' payroll system kept records of each employee's schedule, hours worked, and codes entered by the employees to signify an exception to their respective schedules. Plaintiff was paid one and one-half times his normal hourly rate for any additional hours worked on unscheduled shifts without regard to whether he had worked more than forty hours in one week.

Tambrands also affords its employees "flex-time," which is subject to certain employer restrictions. Specifically, "[f]lex-

time is the opportunity to schedule work time to respond to business and personal issues by working hours outside the employee's regular schedule, but still within the total number of scheduled hours for the pay week." Tambrands Flex–Time Policy, Attached as Exhibit I to Defendant's SMF. Flex-time is considered a privilege and must be approved by the line coach.[1]

Plaintiff received training regarding use of the ESS system to verify his scheduled work hours and review his available leave. Plaintiff was also trained to change his time entries upon discovery that any were incorrect. Upon completion of his ESS training, Plaintiff signed a document which stated, "I have read and understand the general payroll policies for Tambrands. I also understand that falsification of my time sheet is cause for termination." *See* ESS Verification for End Users, Attached as Exhibit C–1 to Defendant's SMF.

### B.  Plaintiff's First FMLA Request

Between November 2001 and November 2004, Plaintiff's wife (hereinafter "Mrs. Greenwald") was out of the work force; she remained at home to care for the Greenwalds' three children. On or about November 3, 2002, Mrs. Greenwald's grandfather was diagnosed with lung cancer. Less than six weeks later, Mrs. Greenwald's mother suffered an Arterio Venous Malformation and required hospitalization. Plaintiff's mother was not expected to recover from this condition.

On December 16, 2002, Plaintiff submitted an FMLA request to Tambrands and designated Linda Gastonguay, his mother-in-law, as the patient requiring care. *See*

FMLA Application, Attached as Exhibit C–13 to Defendant's SMF. Tambrands denied this request on the grounds that Plaintiff was not eligible for FMLA leave because Ms. Gastonguay was not a covered relative under the terms of the statute. *Id.* A Tambrands Human Resources employee provided Plaintiff with another FMLA packet so he could apply for leave to care for his wife.

### C.  Plaintiff's Second FMLA Request

As a result of her family members' health problems, Mrs. Greenwald became overwhelmed with stress, anxiety, and depression. She spent many full days in bed crying, and when she was up, she would frequently scream at Plaintiff and their children. Plaintiff alleges that during this time of heightened stress and anxiety, Mrs. Greenwald was unable to perform her routine activities. Mrs. Greenwald sought medical care from Tracy Creaser, a family nurse practitioner, on December 17, 2002. At that time, Ms. Creaser prescribed the prescription medications Xanax and Effexor. Mrs. Greenwald subsequently visited Ms. Creaser on December 30, 2002, January 30, 2003, and February 17, 2003.

On January 14, 2003, upon request from Mrs. Greenwald, Ms. Creaser filled out FMLA paperwork and certifications for Plaintiff. In section three of the FMLA certification, Ms. Creaser indicated that Mrs. Greenwald's condition satisfied the "Absence Plus Treatment" requirements,[2] which state as follows:

(a) A period of incapacity of more than three consecutive calendar days (including any subsequent treatment or

---

1. A line coach is the leader or supervisor of a group of employees.

2. The "Absence Plus Treatment" requirements are located on the Certification of

Health Care Provider form published by the United States Department of Labor. The definitions track the language of 29 C.F.R. § 825.114.

period of incapacity relating to the same condition), that also involves:

(1) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

(2) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

*See* FMLA Absence Certification, Attached as Exhibit M–3 to Defendant's SMF. The facts supporting Ms. Creaser's certification are the following:

Spouse's mother and father have severe medical conditions (one hospitalized) and other with terminal cancer. Increased stress on spouse. Unable to manage well without support of spouse. First Med OV [medical office visit] for this stress 12/17/02, monthly F/U [follow-up] OVS [office visits] recommended as needed.

*Id.* Plaintiff placed the FMLA certification on Business Leader Karen Johnson's desk on the night of January 30, 2003, with the intention that she would receive it the following Monday morning. Plaintiff alleges that Ms. Johnson advised him that she had received the paperwork and would forward it to the appropriate person. Ms. Johnson advised Plaintiff that his application for FMLA leave was approved unless there was a problem with the paperwork and that she would treat the most recent date that he had missed work because of his wife's illness as FMLA leave. Though Tambrands never expressly approved the FMLA leave, Plaintiff alleges it impliedly did so by permitting Mr. Greenwald to take FMLA leave. *See* Affidavit of Mark Greenwald, Attached as Exhibit C to Plaintiff's Response to Defendant's Amended Statement of Material Facts (Docket Item No. 50) at 7–8. Indeed, Tambrands admits that it never refused to allow Plaintiff to leave as requested, nor did it ever suggest that Plaintiff would be disciplined for doing so.

### D. Plaintiff's Work Attendance

From December 2002 through February 2003, Plaintiff's attendance at work was sporadic. He was frequently late, would often leave early, or at times would not be present for a scheduled shift. In certain instances, Plaintiff would work on unscheduled days and not work on a scheduled day. The result of this practice was that Plaintiff would receive unscheduled work pay at the rate of one and one-half times his hourly rate when he worked unscheduled shifts, irrespective of how many regularly scheduled shifts he had worked—or missed—that week. In late December or early January, Ms. Johnson indicated to Plaintiff that if he was to miss or leave early from a scheduled shift and make up the hours during an unscheduled shift, Plaintiff would be required to enter the time worked as "flex time" and not overtime—thus eliminating the windfall benefit of substituting unscheduled hours.

In January 2003, Plaintiff received multiple phone calls at work from his wife who stated that she was not doing well. When his wife phoned the company, Plaintiff would often leave without seeking the approval of his supervisors.

On January 26, 2003, Plaintiff arrived at work one hour late. Plaintiff did not deduct this hour from his timesheet, instead assuming that Kathleen Fickett, his line leader, would deduct the hour while she adjusted her own timesheet and the timesheet of another employee. Plaintiff did not follow-up to determine whether his

timesheet had been corrected. He was paid for the extra hour. This incident represented one of two timekeeping discrepancies cited by Tambrands for Plaintiff's eventual termination.

The second timekeeping discrepancy involved Plaintiff being paid for a full day not worked. Plaintiff was not scheduled to work on February 5, 2003, but he agreed to fill in for a co-worker on that day. Plaintiff was paid at the overtime rate for his hours supposedly worked on February 5, but Tambrands has no record of Plaintiff ever reporting to work on that day. On or about February 7, 2003, Plaintiff's co-worker, Linda Picard, observed Plaintiff on a time-keeping computer checking his time sheet. Ms. Picard believed that Plaintiff was entering overtime for days worked in the middle of the week, when in fact Plaintiff had not been at work. Ms. Picard reported this to her supervisor, Ms. Fickett.[3] Ms. Fickett could not remember seeing Plaintiff at the plant on February 5, 2003.

When questioned about his work activities on February 5, Plaintiff indicated that he had worked in the "super winding area" on either the day or the night shift. Fickett reviewed the paperwork from February 5 and could not find Plaintiff's name or initials on any document or timesheet that corroborated his presence at work that day. Furthermore, the Journal Replay Report[4] gave no indication that Plaintiff had entered the building on February 5. Finally, Plaintiff had made no quality control entries on February 5. Plaintiff did not update his timesheet to reflect the change.

Following the company's conclusion that Plaintiff had not been at work on February 5, William Lawrence, the Operations Manager and Ms. Johnson, the Business Leader, confronted him with the discrepancy in time keeping. Plaintiff asserted that he filled out his time sheet early in the week and had intended to work on February 5, but his wife was not well on the morning of February 5 and as a result, he did not come to work that day. Plaintiff apologized, blamed his errors on a lack of sleep, and offered to pay back the unearned wages to Tambrands.

Mr. Lawrence and Ms. Johnson concluded that Tambrands should terminate Plaintiff's employment. Plaintiff received a memorandum from Johnson which stated that the discrepancies in his time sheets reflect "a violation of our basic citizenship expectations, and as a result ... your employment is terminated." Memorandum from Karen Johnson to Mark Greenwald (Feb. 13, 2002), Attached as Exhibit C–20 to Defendant's SMF. Plaintiff's employment termination was effective immediately.

Following termination, Plaintiff received an evaluation titled Re–Employment Eligibility (Attached as Exhibit H to Defendant's Additional Statement of Material Facts (Docket Item No. 51)), prepared by Ms. Johnson. In this evaluation, Plaintiff received a mark of "weak" in five out of eleven categories and received a negative rehire recommendation. *Id.* This retaliation lawsuit followed.

### III. Family Medical Leave Act

The FMLA was enacted "to help working men and women balance the con-

---

**3.** The record supports a finding that Ms. Fickett and Ms. Picard demonstrated animosity toward Plaintiff as a result of his sporadic work attendance and the increased pressures placed upon other employees to work short-handed.

**4.** The Journal Relay Report tracks information about when, or if, an employee enters the Tambrands facility.

flicting demands of work and personal life." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir.1998). In enacting the FMLA, Congress noted that "it is important for the development of children and the family unit that fathers and mothers be able to participate in early childrearing and the care of family members who have serious health conditions," 29 U.S.C. § 2601(a)(2), and that "the lack of employment policies to accommodate working parents can force individuals to choose between job security and parenting." *Id.* § 2601(a)(3).

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period for one or more of the following: ... (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." *Id.* § 2612(a)(1). Leave to care for a spouse with a serious health condition "may be taken intermittently or on a reduced leave schedule when medically necessary." *Id.* § 2612(b)(1).

Any employee who qualifies for leave under the FMLA "shall be entitled, on return from such leave—(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* §§ 2614(1)(A), (B). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]," *id.* § 2615(a)(1), nor may the employer "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." *Id.* § 2615(a)(2).

## IV. McDonnell Douglas Framework

█ Plaintiff's claim for employment retaliation invokes the burden shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Although Plaintiff contends that *McDonnell Douglas* does not apply to this case, *see* Plaintiff's Objection to Defendant's Motion for Summary Judgment at 19, First Circuit Court of Appeals precedent clearly requires the rejection of this position. *See Hodgens,* 144 F.3d at 160 ("We ... hold that, when there is no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies to claims that an employee was discriminated against for availing himself of FMLA-protected rights."). Plaintiff has not presented any evidence, nor does the Court find any, of direct discrimination. Accordingly, the *McDonnell Douglas* burden shifting scheme applies to this case.

The *Hodgens* Court set forth the procedures this Court must follow in applying *McDonnell Douglas.*

> Under [the *McDonnell Douglas* ] framework, a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a *prima facie* case of discrimination or retaliation. If he does so, then the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's [termination], sufficient to raise a genuine issue of fact as to whether it discriminated against the employee. ... If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected

FMLA leave [or other unlawful discrimination].

*Hodgens,* 144 F.3d at 160–61.

■ To make out a *prima facie* case of retaliation, a plaintiff must show that "(1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; [and] (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Id.* at 161. In its Amended Motion for Summary Judgment, Defendant contends that Plaintiff cannot establish a *prima facie* case of retaliation and thus is entitled to an entry of summary judgment.

### V. Plaintiff's *Prima Facie* Case

### A. Whether Mrs. Greenwald Suffered From a Serious Health Condition

■ Defendant's first attack on Plaintiff's *prima facie* case is that Mrs. Greenwald did not suffer from a serious health condition. If this contention is indeed true, then Plaintiff would not be eligible for FMLA leave. *See, e.g., Schmittou v. Wal–Mart Stores, Inc.,* No. Civ. 011763 (JRT/RLE), 2003 WL 22075763, at *7 (D.Minn. Aug. 22, 2003) (Plaintiff "was not eligible for leave under the FMLA, so it was impossible for her to engage in any activity protected by the statute."); *Rogers v. Bell Helicopter Textron, Inc.,* No. CA3–99–CV–988–R, 2000 WL 1175647, at *3 (N.D.Tex., Aug. 17, 2000) (Plaintiff's "retaliation claim fails under the *McDonnell Douglas* framework because the Court has already found that Rogers did not suffer from a 'serious health condition' and, therefore, was not entitled to FMLA leave.").

The term "serious health condition" is defined by the relevant FMLA implementing regulations as follows: [5]

(a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:

. . . . .

(2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114. Plaintiff must therefore demonstrate that Mrs. Greenwald suffered from a period of incapacity of more than three consecutive days.[6]

---

5. There is no evidence in the record suggesting that Mrs. Greenwald's condition satisfies any of the other definitions of "serious health condition" set forth in 29 C.F.R. § 825.114.

6. Plaintiff, in addition to arguing that Mrs. Greenwald suffered from a serious health condition, also asserts that whether or not Mrs. Greenwald in fact had a serious health condition is immaterial to the present dispute.

In support of his position that Mrs. Greenwald was incapacitated for more than three consecutive days, Plaintiff has submitted to the Court Mrs. Greenwald's affidavit. *See* Affidavit of Candid Greenwald, Attached as Exhibit D to Plaintiff's Response to Defendant's Amended Statement of Material Facts (Docket Item No. 50). In her affidavit, Mrs. Greenwald states that from just before Christmas 2002, until the end of January, 2003, she went through periods lasting four to five days during which she was bedridden while crying or confined to a couch. *Id.* at 5. Mrs. Greenwald states that during these periods, she was unable to perform her regular daily activities and relied upon her husband for support and emotional stability, to wit:

> Although Mark did not provide for my physical needs like bathing or taking me to the bathroom during this period, he did prepare food for me and brought it to me in bed if I had stayed in my room. He purchased my prescriptions and brought them to me in bed if I was there. He got my baths ready for me. He encouraged me to take showers, to come downstairs, and to get involved in family activities. In addition, he assisted me by doing all of the regular household and childcare activities I would have previously done. Without his help, it is likely that I would have had a nervous breakdown.

*Id.* at 6.[7]

In response, Defendant contends that Mrs. Greenwald was never in fact unable to perform activities of daily living and provides citations to Mrs. Greenwald's deposition for what Defendant contends are examples of her ability to function without the assistance of her husband. Both parties have gone to great lengths in the summary judgment process to document Mrs. Greenwald's activities during the period in question. Due to the existence of factual disputes in the record, the Court finds that there exist genuine issues of material fact as to whether Mrs. Greenwald suffered from a serious health condition and the Court is unable to conclude as a matter of law[8] that Mrs. Greenwald did not in fact suffer from such a condition.[9] The Court is satisfied that there also exist

---

*See* Plaintiff's Objection to Defendant's Motion for Summary Judgment at 8. Plaintiff claims that because 29 U.S.C. § 2615(a)(1) creates a violation of the FMLA for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," Tambrands violated the statute by its action of firing Plaintiff for his attempt to exercise his claimed rights under the FMLA. This argument fails as it places the proverbial "cart before the horse." The FMLA does not provide Plaintiff with a cause of action against his employer for the employer's denial of a right that does not exist. As the statute clearly states, Plaintiff must be attempting to exercise "any right" provided under the FMLA. Failure to establish such a right would be grounds for an entry of summary judgment.

7. The Court notes that the FMLA requires Plaintiff to be providing care for his wife. Any additional childcare burden placed upon Plaintiff as a result of his wife's condition is not covered activity under the FMLA as it is undisputed that none of the children have a "serious health condition."

8. Whether an employee suffers from a "serious health condition" is a question of law. *See Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 499 (7th Cir.1999).

9. The Court finds little merit to Defendant's contention that Plaintiff did not request intermittent leave on his second FMLA form and thus never triggered an obligation on the part of Tambrands to respond to the leave application. "[C]ourts have held that an employer with some prior knowledge of an employee's medical situation may not rely on an unspecific request for FMLA leave to avoid the duty to inquire into whether the request is FMLA - qualifying." *Jennings v. Parade Publication,* No. 01–Civ–8590(TPG), 2003 WL 22241511, at *4 (S.D.N.Y. Sept. 30, 2003). As evidenced

genuine issues of material fact as to whether Plaintiff provided care for Mrs. Greenwald.

### B. Taking Leave in a Protected Manner

■ Defendant next contends that Plaintiff did not take leave in a FMLA protected manner insofar as his absences from work were "unscheduled and unpredictable." For support of the legal proposition that the FMLA does not provide the right to unscheduled leave at a moment's notice, Defendant cites to *Miller v. GB Sales & Serv.*, 275 F.Supp.2d 823, 829 (E.D.Mich.2003). In *Miller*, the court noted that "the FMLA does not provide an employee suffering from depression with a right to 'unscheduled and unpredictable, but cumulatively substantial, absences' or a right to 'take unscheduled leave at a moment's notice for the rest of her career.'" *Id.* (quoting *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847 (8th Cir.2002)). The *Miller* court noted, however, that despite the above quoted dicta, the *Spangler* court held that "plaintiff provided sufficient notice to her employer that her 'unscheduled and unpredictable' absences were due to her depression to create a genuine issue of material fact with regard to whether she provided appropriate notice." *Miller*, 275 F.Supp.2d at 830. The same conclusion applies here. There are genuine issues of material fact as to whether Plaintiff provided Tambrands with adequate notice of his absences.

### C. Adverse Employment Action

There is no dispute that Plaintiff suffered an adverse employment action when he was terminated by Tambrands. As a result, Plaintiff satisfies the second prong of the *prima facie* case.

### D. Causal Connection Between Protected Activity and Adverse Employment Action

■ Plaintiff has presented evidence that his supervisor resented the fact that Plaintiff missed periods of work and placed increased burdens on his colleagues. Furthermore, the record supports a finding that Plaintiff was terminated only four days after he last missed a day of work. As the Tenth Circuit Court of Appeals has noted, "protected conduct closely followed by adverse action may justify an inference of retaliatory motive." *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996). Accordingly, the Court is satisfied that Plaintiff meets the *prima facie* burden of establishing a connection between his protected activity and the adverse employment action taken by Tambrands.

The Court thus finds for purposes of summary judgment that Plaintiff has carried his burden of establishing a *prima facie* case of retaliation. First, Plaintiff has presented evidence in the summary judgment record raising genuine issues of material fact as to whether he availed himself of a protected right. Second, Plaintiff was adversely affected by an employment decision. Third, a reasonable factfinder could find a causal connection between Plaintiff's protected activity and the adverse employment action.

### VI. Tambrands' Legitimate, Non–Discriminatory Reason for Terminating Plaintiff's Employment

■ Plaintiff having established a *prima facie* case of retaliation for purposes of

---

by Plaintiff's multiple applications for FMLA leave, Tambrands was clearly on notice of Plaintiff's family's medical situation.

The Court likewise finds that there is insufficient evidence in the summary judgment record to conclude that Mrs. Creaser's failure to complete certain sections on the FMLA form warrants a conclusion as a matter of law that Mrs. Greenwald never suffered from a serious health condition.

this summary judgment motion, under *McDonnell Douglas,* the burden shifts to Tambrands to articulate a legitimate, non-discriminatory reason for terminating Plaintiff's employment. Tambrands has done so in this case. Tambrands has submitted evidence that Plaintiff failed to correct his timesheet to remove hours he had in fact not worked. As noted *supra,* Plaintiff signed papers stating, "I have read and understand the general payroll policies for Tambrands. I also understand that falsification of my time sheet is cause for termination." *See* ESS Verification for End Users, Attached as Exhibit C–1 to Defendant's SMF. Accordingly, the Court is satisfied for purposes of summary judgment the Defendant's have proffered a legitimate, non-discriminatory reason for terminating Plaintiff's employment.

## VII. Issues of Pretext

■ Because Plaintiff erroneously relied on his position that the *McDonnell Douglas* burden shifting framework is not applicable to this case, he has not thoroughly developed a position on the issue of pretext in his summary judgment papers. Nonetheless, the Court is cognizant of the instructions provided by the First Circuit Court of Appeals in analyzing issues of pretext that rarely are supported by any direct evidence. "[W]here a plaintiff in a discrimination case makes out a *prima facie* case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious' about granting the employer's motion for summary judgment." *Hodgens,* 144 F.3d at 167 (quoting *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 928

(1st Cir.1983)). Taking into account the entire summary judgment record—and not just the absence of any thoroughly developed argument in Plaintiff's summary judgment opposition—the Court is satisfied that this case presents the type of situation in which the Court of Appeals urged caution.

■ A nonmoving plaintiff may demonstrate pretext "either indirectly by showing that the employer's stated reasons for its adverse action were not credible, or directly by showing that that action was more likely motivated by a discriminatory reason." *Hodgens,* 144 F.3d at 168. There is sufficient evidence in the summary judgment record to raise genuine issues of material fact as to whether Defendant was motivated by discriminatory purpose. First, Plaintiff has offered explanations for the two mistakes on his timesheet and Defendant admits that Plaintiff offered to repay the unearned wages.[10] Second, Plaintiff was fired only four days after he last missed a day of work—a factual circumstance that could allow a factfinder to infer pretext.

The role of this Court at the summary judgment stage " 'is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.' " *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On that basis, the Court is satisfied that a reasonable factfinder could find that Defendant's proffered nondiscriminatory reason was in fact a pretext for Plaintiff's exercise of a federally protected right.

---

**10.** The Court notes that Tambrands' exception-based timekeeping procedures in place at the time of Plaintiff's termination invited employee error. Indeed, the record supports the fact that subsequent to Plaintiff's termination, Tambrands instituted a policy requiring employees to review time sheets at the end of each payroll period to avoid inadvertent failure to remove hours not worked.

## VIII. Conclusion

For the reasons set forth above, it is **ORDERED** that Defendant's Motion for Summary Judgment be, and it is hereby, **DENIED**.